IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 5, 2021, at Jackson

**PHILLIP DANIEL MORTON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2012-D-3049    Cheryl A. Blackburn, Judge**

_____

**No. M2021-00171-CCA-R3-PC**

_____

A Davidson County jury convicted the Petitioner, Phillip Daniel Morton, of first degree premediated murder. The Petitioner appealed, and this court affirmed the Petitioner's conviction. The Petitioner timely filed a post-conviction petition, alleging that he received the ineffective assistance of counsel. The post-conviction court denied relief. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Ryan C. Caldwell, Nashville, Tennessee, for the appellant, Phillip Daniel Morton.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; Joseph E. Clifton and Megan M. King, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Procedural History and Facts**
**A. Procedural History**

On November 13, 2012, a Davidson County grand jury indicted the Petitioner for first degree premediated murder. The trial occurred on February 3-5, 2014, and the jury convicted the Petitioner as indicted. The trial court entered a judgment on February 5, 2014, imposing a life sentence. The Petitioner filed a motion for new trial and a petition for writ of error *coram nobis*. The trial court held hearings and denied the writ of error *coram nobis* and motion for new trial on January 6, 2017. On appeal, this court affirmed the trial court, and our supreme court denied the Petitioner's application to appeal on November 14, 2018. *State v. Phillip Daniel Morton*, No. M2017-01083-CCA-R3-CD,

2018 WL 3487220, at *1 (Tenn. Crim. App., at Nashville, July 7, 2018), *perm. app. denied* (Tenn. Nov. 14, 2018). The Petitioner, *pro se*, timely filed a petition for post-conviction relief on December 17, 2018, and his post-conviction counsel filed an amended petition on October 15, 2020.

## B. Trial

On direct appeal, this court summarized the facts presented at trial as follows:

On August 23, 2012, after learning that his ex-girlfriend was assaulted by Keith Gaston, the [Petitioner] shot and killed Gaston, the victim, with a single gunshot to the head while they were at Hard Times Bar & Grill.

As relevant to the issues raised in this appeal, Dr. Adele Lewis, chief medical examiner for Metro Nashville Davidson County, was tendered as an expert in the field of forensic pathology and testified that she performed the autopsy of the victim on August 23, 2012. She concluded that the victim's cause of death was a single gunshot to the back of his head and explained that the gun had to be in contact with the victim's head when he was shot.

Detective Matthew Filter of the Metropolitan Nashville Police Department testified that he was assigned as the lead detective in the shooting, examined the scene, and found the license of [Ms.] Crowder on the victim's body. Detective Filter recovered video surveillance footage from the bar and described the timeline of the [Petitioner]'s and the victim's movements leading up to and after the shooting. Without objection, the video recordings were admitted into evidence and played for the jury.

Exhibit 6 contains thirteen clips from different camera views covering approximately thirteen minutes before the shooting and several minutes afterward. In the clips, the [Petitioner] can be seen moving throughout the bar, walking back and forth from the pool table area, through the bar area, to the dance floor and stage, and eventually into the "cubbyhole" area behind where the victim was sitting. The [Petitioner]'s friend, Arnie Cosby, can be seen standing near the opposite end of the bar for most of the night, talking with the [Petitioner] whenever he passed by. Shortly before the shooting, the video recording shows the [Petitioner] waving Cosby over to the cubbyhole area. Once Cosby joins the [Petitioner], the two men can be seen making their way toward the victim right before the shooting occurs. Specifically, the video recording shows Cosby walking with the [Petitioner] directly behind him until they were directly beside the victim. The victim's date,

2

Victoria Anderson, was in between the victim and the camera during the shooting so it was not immediately evident who shot the victim. Once the shot was fired, Cosby and the [Petitioner] immediately ran away from the victim, and the [Petitioner] can be seen holding a beer in one hand and something under his shirt with his other hand.

On cross-examination, Detective Filter confirmed that the [Petitioner] was "frisked or patted down" when he entered the bar. He confirmed that Shiema Reid was the bartender that night but was not near the cubbyhole area when the shooting occurred. He also confirmed that Robert Parker was working as a photographer at the bar that evening and was standing adjacent to the area of the shooting.

David Martin testified that he was working as a security guard at the bar on the night of the shooting. He confirmed that the [Petitioner], nicknamed "Rabbit," came to the bar frequently and that, on the night of the shooting, the [Petitioner] appeared angry and told Martin, "I'm going to kill you[,]" while the [Petitioner] was being frisked. He confirmed that there were no security issues with the victim or anyone else in the bar prior to the shooting. On cross-examination, Martin explained that even though the [Petitioner] is known as a "jokester," the [Petitioner] did not appear to be joking and that he took the [Petitioner]'s threat seriously.

Samantha Seay, owner of Hard Times Bar & Grill, testified that she was bartending on the night of the shooting with another bartender, Laquinta, and waitress, Shiema Reid. Seay provided the bar's video recordings to the police and confirmed that the [Petitioner] was a regular patron at the bar and was present the night of the shooting.

Vertricie Willis, the mother of the victim, testified that Taffney Crowder was the victim's live-in girlfriend. Willis said she went to the bar that night with the victim, Victoria Anderson, and Michael McEwen. Willis testified that the [Petitioner] approached her and commented on her appearance, and that she later pointed the [Petitioner] out to the victim to which the victim responded that he knew the [Petitioner]. Willis confirmed that the victim did not have any altercations with anyone at the bar that night. She said she saw the [Petitioner] in the vicinity of the victim shortly before the shooting but that she was not sure of his exact location afterward or who else could have been close enough to shoot the victim.

3

Victoria Anderson testified that she went to the bar with the victim and his mother and that they were frisked upon entry. She confirmed that Willis pointed out the [Petitioner] and said the [Petitioner] "kept staring at us, watching everything we w[ere] doing." Anderson explained that she and the victim spent some time shooting pool before they eventually made their way to the dance floor area, at which point she saw the [Petitioner] following them. She identified herself as the woman in the video recording standing in front of the victim when he was shot but said she did not notice anything or anyone around them at that time. She confirmed that the victim did not have any altercations with anyone that night.

Taffney Crowder, the victim's live-in girlfriend, previously dated the [Petitioner]. Three to four months before the shooting, the victim and the [Petitioner] "had a few words" after the [Petitioner] offered to buy [Ms.] Crowder a drink while she was on a date with the victim. The day before the shooting, the victim assaulted [Ms.] Crowder and she went to the hospital the next morning; she was placed in a boot on her leg and a sling on her arm. The victim had taken her license and money without her permission so that she would be forced to return to him after their fight. She explained that the [Petitioner] remained friends with her father after they broke up and that the [Petitioner] had dinner with [Ms.] Crowder and her father on the night of the shooting. She learned of the victim's shooting at around 4:00 the next morning and she and her father spoke to the [Petitioner] shortly after. The [Petitioner] told her that he left the bar approximately twenty minutes before the shooting and immediately traveled to Jackson. Although [Ms.] Crowder initially testified that she did not recall telling the police that the [Petitioner] said "he was sorry that happened to [her] and that it was f[—]ked up" once he learned that the victim assaulted her or that the [Petitioner] owned a revolver, the State introduced evidence confirming that [Ms.] Crowder told the police this information immediately after the shooting.

Lisa Whitaker, crime scene technician for the Metropolitan Nashville Police Department, testified that she responded to the scene, prepared a diagram of the bar, took photographs, and processed evidence. She testified that no shell casings were retrieved and opined that the weapon used in the shooting was likely a revolver because it would not eject a shell casing. On cross-examination, Whitaker agreed that she could not definitively state the weapon was a revolver.

Robert Parker testified that he was working as a photographer at Hard Times Bar & Grill on the night of the shooting and identified himself in the

video recording near the back door. He said the [Petitioner] originally entered the back door with him while helping him carry in equipment but that the [Petitioner] went back outside and reentered through the front door with security. Approximately forty-five minutes before the shooting, Parker said the [Petitioner] "asked can he have a seat, there was something he wanted to get out of his boot." Parker saw the [Petitioner] remove his boot but did not see if the [Petitioner] took anything out. Parker said the [Petitioner] returned later in the evening and stated, "I'm tired of these n[———]s around here, I'm about to kill me a mother f[——]r." Parker said he tried to calm the [Petitioner] down because the [Petitioner] indicated someone had "put their hands on" him. Parker said the [Petitioner] asked whether he could exit through the back door and Parker indicated that only security or the bar owner could access that door.

Parker testified that the [Petitioner] had been drinking and appeared to be "nipsy," but that he was not staggering or slurring his speech. He said he had not seen the victim in the bar before and that, although he was facing the victim when he was shot, he was looking at his computer when the victim was killed. He confirmed that he saw the [Petitioner] in the cubbyhole area, about one to two feet from the victim, moments before the shooting. When he heard the shot, Parker said he looked up and saw the [Petitioner] run from the area where the victim was and that the [Petitioner] "had something in one hand and was fumbling with the other hand." He opined that there was no one other than the [Petitioner] who was close enough to the victim to have shot him. He confirmed that the video recording accurately depicted what he remembered occurring that night. At the close of the State's proof, Defense counsel requested a jury charge of voluntary intoxication based on Parker's testimony that the [Petitioner] had been drinking. The trial court denied the request based on insufficient evidence and stated that "it was very clear [the Petitioner] wasn't" intoxicated.

As part of the defense proof, Officer Bryan Toney of the Metropolitan Nashville Police Department testified that he responded to the shooting and helped to preserve the scene and interview witnesses. He specifically interviewed Robert Parker who told him that he heard the commotion from the shooting but did not see exactly what happened. In response, the State called Detective Adam Weeks of the Metropolitan Nashville Police Department who testified that he responded to the shooting and later spoke with Robert Parker at the police station. On cross-examination, he confirmed that a projectile, but no gun, was recovered from the scene.

5

*Phillip Daniel Morton*, 2018 WL 3487220, at *1.

The jury convicted the Petitioner of the first degree murder of Mr. Gaston, for which he received a life sentence. *Id.*

### C. Post-Conviction Hearing

The Petitioner alleged, as relevant on appeal, that Counsel was ineffective because he failed to communicate adequately with the Petitioner in order to develop a proper defense strategy and he failed to adequately cross-examine Ms. Crowder regarding a prior fight between her uncle and the victim. At a hearing on the petition, the parties presented the following evidence:

The Petitioner testified that he had two attorneys who represented him at trial ("Counsel" and "Co-Counsel"). He remained incarcerated pending trial for approximately a year and a half. He first met Counsel in September 2013, and although the Petitioner was housed in Nashville, Counsel only met with the Petitioner "maybe four or five times." Counsel never provided all of the discovery to the Petitioner, only "bits and pieces of it." Specifically, the Petitioner never saw video footage provided in the discovery until trial. The Petitioner asked Counsel for the recordings, but Counsel never provided them.

The State had obtained surveillance video of the shooting that was "grainy and blurry." The first attorney from the Public Defender's Office to represent the Petitioner, Sarah King, tried to view the recording with him on a laptop but they were unable to "make out" anything. Ms. King told the Petitioner that she would "get a[n] expert." Ms. King represented the Petitioner through his arraignment and when she accepted another job, Counsel became his attorney. The Petitioner explained to Counsel what Ms. King had advised about the video, but Counsel never viewed the video with the Petitioner. The Petitioner first saw the video of the shooting at trial.

The Petitioner alleged that Counsel never discussed with him the possibility of an "intoxication defense" in light of the Petitioner's history of alcohol abuse. The Petitioner stated that he was intoxicated on the day of the shooting, describing himself as "dead drunk." He stated that he had purchased a bottle of Crown Royal, "had" a pint of Paul Masson, was drinking beer, smoking weed, and snorting cocaine, in the time leading up to the shooting.

About the defense strategy at trial, the Petitioner said that he was unaware of any defense strategy. He said Counsel talked with the Petitioner for "maybe two or three minutes" on the few occasions he met with him. The Petitioner wanted to testify at trial but "was maybe coerced" by Counsel and Co-Counsel who threatened "to walk off [his]

6

case" if he chose to testify. The Petitioner explained that he had wanted to testify to tell the jury that he did not kill the victim. The Petitioner did not know who shot the victim and denied possession of a gun at the time of the shooting.

The Petitioner was unaware of any offer conveyed in his case or if Counsel ever attempted to negotiate a settlement with the State. The Petitioner alleged that Counsel and Co-Counsel also failed to interview George Crowder, Ms. Crowder's father, Michael Crowder, Ms. Crowder's uncle and Ms. Crowder's two children who would have testified that George and Michael Crowder had stated they were going to kill the victim for assaulting Ms. Crowder.

The Petitioner asked Counsel to seek a continuance for his trial because the State failed to turn over evidence that would have helped in his defense. He said without seeing all the evidence, his decision to proceed to trial was not knowing because he did not "have a grasp of the evidence."

The Petitioner testified that Counsel and Co-Counsel failed to adequately cross-examine Ms. Crowder to prove that the victim and Ms. Crowder's uncle had gotten into a fight the day before the murder. At trial, Ms. Crowder denied any sort of confrontation between the victim and her uncle. The Petitioner gave Counsel a supplemental report that indicated that Ms. Crowder had reported that the victim and her uncle had engaged in a fight. The supplemental report is part of the record and the relevant portion is, "[Ms. Crowder] said the day before Keith Gaston was murdered Keith Gaston and her uncle were outside drinking beer. She said her uncle stayed with them occasionally. Keith Gaston and her uncle got into a fight."

On cross-examination, the Petitioner agreed that Ms. King had provided him with a copy of his discovery that he reviewed; however, he never discussed the discovery with Counsel. The Petitioner maintained that Counsel never discussed the defense of voluntary intoxication with him, but he agreed that Counsel elicited testimony at trial about the Petitioner's alcohol consumption and related behavior. He also agreed that Counsel requested a jury instruction on voluntary intoxication but the trial court declined to give the instruction.

The Petitioner maintained that Counsel and Co-Counsel argued with him about testifying so he "let them win." He agreed that he signed the paperwork indicating that he was choosing not to testify.

Counsel testified that he had practiced criminal law at the Public Defender's Office for twenty-six years. Counsel represented the Petitioner in his 2014 murder trial. Ms. King, an assistant public defender at the time, filed the motion for discovery, but Counsel

reviewed the State's response once he was assigned the Petitioner's case. Counsel met with the Petitioner at court appearances, and also at the jail to discuss the case. Counsel recalled that the Petitioner asked a lot of questions as they discussed the case and the State's evidence against the Petitioner. Counsel did not recall trying to negotiate a settlement of the case, but the Public Defender's Office file reflected that Ms. King had negotiated with the State and the State offered to reduce the charge to second degree murder in exchange for a forty-year sentence to be served at a hundred percent. Counsel felt comfortable that Ms. King would have conveyed that offer to the Petitioner but described the offer as "implausible" given the Petitioner's age and the length of the sentence.

The case was originally set for October 2013, but when Ms. King left the Public Defender's office in August 2013, Counsel requested a continuance to allow him time to prepare. The trial court rescheduled the trial for February 3, 2014. According to office records, Ms. King met with the Petitioner fourteen times, and Counsel met with him seven times. Counsel denied any knowledge of exculpatory evidence that was not provided before trial.

Counsel agreed that the surveillance video footage of the shooting was blurry; however, he was not sure what an expert would have added. He explained that the Public Defender's Office had an investigator who was proficient with technology and would have advised the attorneys about the quality of the video. It was, however, recorded at night in a very crowded bar. Counsel stated that an expert would not have been able to testify about what he saw on the video as the video was the best evidence and the content would be determined by the jury.

Counsel testified that he was aware of Ms. Crowder's statement to police about her uncle and the victim engaging in a fight and that the office investigators "had looked into this fight allegation." This information was known to him at the time of cross-examination. He noted that he had not cross-examined Ms. Crowder at trial but that Co-Counsel had conducted the cross-examination.

Counsel testified that the defense strategy was to attack identification, asserting that it was not the Petitioner who shot the victim. Counsel did not recall independently his conversation with the Petitioner about the decision to testify, but he routinely spoke with all of his clients about the pros and cons of testifying. He stated that the Petitioner had a criminal history that included a federal firearms conviction that would not otherwise be introduced if the Petitioner did not testify. Given the facts of this case, Counsel "would generally not have favored" the Petitioner testifying.

Counsel elicited testimony at trial about the Petitioner's consumption of alcohol on the night of the shooting. He requested a jury charge on voluntary intoxication, but the

trial court denied his request. He explained that intoxication was not the primary defense because it conflicted with the Petitioner's strong position that he was not guilty. The Petitioner felt so strongly about his position that he even challenged Counsel's intent to suggest in closing argument that voluntary manslaughter "was the correct violation" because he believed it was conceding guilt.

Counsel confirmed that both he and Co-Counsel reviewed the video of the shooting. He could not recall, however, whether he or Co-Counsel reviewed it with the Petitioner. Because the case was based on identification, he believed one or both of them viewed it with the Petitioner, but if that had not occurred, the office investigator would have done so.

After Counsel testified, the State announced that because the Petitioner's allegations were against Counsel as the "lead attorney," the State did not see a need to call Co-Counsel as a witness. Post-conviction counsel stated, "I don't see a need to." No other witnesses were called and the post-conviction court took the matter under advisement. In a subsequent order, the post-conviction court denied relief. It is from this judgment that the Petitioner appeals.

## II. Analysis

On appeal, the Petitioner asserts that he received the ineffective assistance of counsel at trial. He asserts that Counsel failed to: (1) communicate adequately with the Petitioner to develop a proper defense strategy, and (2) adequately cross-examine Ms. Crowder. The State responds that the Petitioner failed to prove his allegations by clear and convincing evidence and, therefore, the post-conviction court properly denied relief. We agree with the State.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be

9

said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must

be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## A. Communication & Defense Strategy

The Petitioner asserts that Counsel failed to adequately communicate with the Petitioner thereby preventing development of a proper defense strategy. He also claims Counsel did not "allow" him to view the video of the shooting. The State responds that the post-conviction court properly denied relief.

In the order denying relief, the post-conviction court made the following findings:

> At the evidentiary hearing [the Petitioner] acknowledged that he was initially represented by Sarah King of the Public Defender's Office after his arrest. Ms. King changed employment and [the Petitioner] met with [the Petitioner] thereafter. [The Petitioner] testified that [Counsel] met him at the jail four or five times and conceded they spoke on court dates although he noted their discussions were minimal. [The Petitioner] stated he got "bits and pieces" of evidence during their meetings. Although [the Petitioner] stated [Counsel] did not provide him his discovery, [the Petitioner] conceded that Ms. King had provided him a copy of the State's discovery response prior to [Counsel] being assigned his case. [The Petitioner] testified that although he asked for an offer one was never conveyed to him.

> [Counsel] testified that he had been employed by the Office of the Public Defender for a total of 26 years. He explained that [the Petitioner]'s case was originally assigned to Sarah King who had represented [the Petitioner] in General Sessions Court and during his first few Criminal Court appearances up until August 11, 2013. When Ms. King resigned to take a position with the post-conviction defender's office [Counsel] took over the case. [Counsel] stated that he reviewed the preliminary hearing recording and had a transcript prepared as part of trial preparations. [Counsel] enlisted Assistant Public Defender [Co-Counsel] to assist and second chair the trial.

> [Counsel] testified that the case file reflects that Ms. King had met with [the Petitioner] fourteen times. Ms. King also had filed the discovery request with the State, and although [Counsel] believed that Ms. King reviewed the discovery with [the Petitioner], he also reviewed the State's evidence with [the Petitioner] as they prepared for trial.

11

[Counsel] noted that his case file reflects that [the Petitioner] had asked Ms. King to produce legal cases for his review and she responded to the request, printing out eight or nine appellate decisions that she provided to him. [Counsel] testified that the State made its offer to Ms. King. [Counsel] stated that he feels comfortable that the offer was relayed by Ms. King to [the Petitioner]; however, he noted that the offer of 40 years at 100% was an "implausible offer" and essentially a life sentence since given [the Petitioner]'s age. [Counsel] could not recall negotiating a plea offer with the State, noting that the assistant district attorney general who represented the prosecution, [The prosecutor], was known to not settle cases and remain firm to his initial offer. [Counsel] testified that when he came on the case, a trial had already been scheduled for October 2013; however, [Counsel] filed a motion to continue in light of Ms. King's departure to allow additional time to prepare. The trial was continued to February 3, 2014. [Counsel] testified that his notes reflect that he met with [the Petitioner] seven times, with some meetings at the jail and some at the courthouse on court dates.

The Court credits the testimony of [Counsel]. Nothing in the record indicates that trial counsel failed to meet with the [P]etitioner and keep him informed of the proceedings. Accordingly, the Court finds that [the Petitioner] has failed to meet his burden of showing by clear and convincing evidence that trial counsel was ineffective in his investigation or communication with [the Petitioner], and he has [not] established any prejudice resulting from the alleged deficiency.

(citations removed).

The evidence does not preponderate against the post-conviction court's finding that Counsel met with the Petitioner in preparation for trial and kept the Petitioner well informed. At the evidentiary hearing the Petitioner acknowledged that he was initially represented by Sarah King of the Public Defender's Office, and Counsel explained that the Petitioner's case was originally assigned to Ms. King, who represented the Petitioner in General Sessions Court and during his first few Criminal Court appearances up until August 2013, when Counsel took over the case. Counsel reviewed the preliminary hearing transcript as part of trial preparations and enlisted Co-Counsel to assist. Further, he requested a continuance that was granted, to allow him adequate time to prepare for trial. The Petitioner testified that Counsel met with him four or five times, noting their discussions were minimal. The Public Defender's Office files indicate that Ms. King met with the Petitioner fourteen times and Counsel met with him seven times.

12

The Petitioner denied receiving discovery, saying he got "bits and pieces" of evidence during their meetings. He later conceded that Ms. King had provided him a copy of the State's discovery response prior to Counsel being assigned to his case and he had reviewed it. Counsel testified that he reviewed the discovery and the Petitioner asked a lot of questions as they discussed the case and the State's evidence against the Petitioner.

The Petitioner testified that, although he asked for a plea, on offer was never conveyed to him. The Public Defender's Office file indicated that the State conveyed an offer to Ms. King. Counsel felt confident that Ms. King would have relayed the offer to the Petitioner; however, he noted that the forty-year offer to be served at 100% was essentially a life sentence given the Petitioner's age. Counsel could not recall any further plea negotiations with the State, noting that the prosecutor assigned to the case was known to remain firm to the initial offer.

The Petitioner claimed no knowledge of a defense strategy at trial and said that he never saw the video of the shooting before trial. He explained that Ms. King attempted to show him the video recording on a laptop computer, but due to the poor quality of the recording, he was essentially unable to view it. Counsel stated that he had no independent recollection of watching the video of the shooting with the Petitioner; however, both he and Co-Counsel viewed the video and he believed that, if they did not view it with the Petitioner then the office investigator did.

As to the Petitioner's contention that Counsel never developed a defense strategy, Counsel stated that due to the Petitioner's adamant stance that he did not shoot the victim, the defense strategy was to attack the identification of the Petitioner as the shooter. At trial, however, Counsel also elicited testimony about the Petitioner's sobriety at the time of the shooting and requested a voluntary intoxication instruction that the trial court denied.

We conclude that the evidence showed that Counsel met with the Petitioner, prepared for trial, and developed a trial strategy based on discussions with the Petitioner. Accordingly, we conclude that the Petitioner has not shown that Counsel was deficient or that any alleged deficiency prejudiced him. He is not entitled to relief as to this issue.

### B. Cross-Examination of Ms. Crowder

The Petitioner asserts that Counsel failed to adequately cross-examine Ms. Crowder. The State responds that the Petitioner failed to establish that Counsel was deficient or that his defense was prejudiced by the cross-examination. We agree with the State.

In the order denying relief, the post-conviction court made the following findings:

13

In the amended petition, [the Petitioner] alleges that trial counsel "failed to adequately cross-examine [Ms.] Crowder to prove that the victim and Ms. Crowder's uncle had gotten into a fight prior to the murder. [The Petitioner] submits [that supplemental] reports provide that there was indeed a fight between them, even though Ms. Crowder denied it." . . . [The Petitioner] testified to the same at the post-conviction hearing and introduced as Exhibit 1 a copy of Detective Filters supplemental report concerning his second interview with Ms. Crowder. . . . [Counsel] testified that [Co-Counsel] cross-examined Ms. Crowder [ ]. Both parties declined to call [Co-Counsel] at the evidentiary hearing although [Co-Counsel] was present and available. [Counsel], however, testified that both he and [Co-Counsel] were aware of the police reports and had looked into the allegation about the fight. The transcript reflects that [Co-Counsel] cross-examined Ms. Crowder and during her testimony the Court held a jury out hearing concerning parts of her testimony. . . .

Having reviewed the transcript, the Court finds that [the Petitioner] has failed to establish by clear and convincing evidence that his trial counsel was ineffective during cross-examination or that he was prejudiced by any alleged deficiency.

(citations omitted).

The evidence does not preponderate against the post-conviction court's findings that the Petitioner failed to show how Counsel was deficient in his cross-examination or how Counsel's cross-examination prejudiced him. Counsel did not cross-examine Ms. Crowder at trial, Co-Counsel did. Co-Counsel was available to testify at the post-conviction hearing but neither side called him as a witness. There was no evidence presented at the hearing that Ms. Crowder's uncle was at the bar on the night of the shooting. The report establishes that Ms. Crowder reported a fight that occurred the day before the shooting, but without more, this evidence would not have resulted in a different outcome at trial. Counsel testified that he and Co-Counsel were aware of the police reports and had investigated the alleged altercation.

Accordingly, we conclude that the Petitioner has failed to prove this allegation by clear and convincing evidence. He is not entitled to relief.

### III. Conclusion

Based on the foregoing, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

15